**Lewis R. Landau** (CA Bar No. 143391)
**Horgan, Rosen, Beckham & Coren, LLP**
23975 Park Sorrento, Suite 200
Calabasas, CA  91302
Email: LLandau@hrbc.com
Voice and Fax: (888) 822-4340

Attorney for Debtor

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No.:   2:13-bk-19713-VZ |
| Zafar David Khan, | Chapter 13 |
| Debtor. | **OPPOSITION TO MOTION TO CONVERT CASE TO CHAPTER 7; DECLARATION OF ZAFAR DAVID KHAN** |
| | Date:        October 7, 2013<br>Time:        11:00 a.m.<br>Place:       Courtroom 1368; Judge Zurzolo<br>                US Bankruptcy Court<br>                255 E. Temple Street, 13th Floor<br>                Los Angeles, CA 90012 |

Zafar David Khan ("Khan" or "Debtor"), herein opposes the motion filed by Kenneth

Barton ("Barton") to convert Debtor's case to chapter 7 [dkt. # 41] ("Motion").  The Debtor's

opposition is contained in the following memorandum of points and authorities as supported by

the declaration and exhibits hereto and concurrently filed Request for Judicial Notice ("RFJN").

///

///

///

///

///

///

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### <u>INTRODUCTION AND OVERVIEW OF ARGUMENTS</u>

The Debtor and Barton have been engaged in their current litigation since 2010.  The litigation resulted in an August 30, 2013 judgment in Los Angeles Superior Court ("LASC") case number YC061581 against RPost International Limited ("RIL"), Debtor and other defendants including related debtor Terrance A. Tomkow ("Tomkow").  *See*, RFJN Exhibit A at internal Exhibit 2 thereto ("Judgment").  As set forth in the Judgment, Barton's claim amount was liquidated by the LASC in the sum of $4,070,081.91.  On September 19, 2013 Debtor timely appealed the Judgment and the matter remains pending on appeal.  *See*, RFJN Exhibit A at internal Exhibit 3 thereto.[1]

Because the Judgment is based on damages arising from Barton's alleged entitlement to common stock in RIL, Barton's claim is subject to mandatory subordination under Bankruptcy Code section 510(b).  Moreover, under the express terms of § 510(b), since Barton's claim arises from a claim to RIL common stock, Barton has no claim in Debtor's case.  On these grounds, Debtor has objected to the Barton claim and a hearing thereon is set for November 4, 2013.  Barton is not a claimant in Debtor's case and does not have standing as a party in interest to demand conversion of Debtor's case.

To the extent the Court reaches the merits of Barton's Motion, then as set forth herein, Barton's Motion consists of an unsubstantiated rant against the Debtor.  Barton's Motion is based primarily on two arguments: (1) that the Debtor was ineligible for chapter 13 relief as of April 14, 2013 because the Barton claim was sufficiently "liquidated" to be counted as an unsecured claim; and (2) that Debtor's schedule B disclosure of zero value for Debtor's shares in the related RPost companies is scheduled in bad faith warranting conversion.  As will be shown herein, the LASC

---

[1] Due to the pendency of the appeal, the Judgment carries no collateral estoppel in this case under California law.  *See*, Cal. Code Civ. Proc. § 1049; <u>Kuykendall v. State Bd. of Equalization</u>, 22 Cal. App. 4th 1194, 1207 (1994).  State law determines the collateral estoppel effect of state court judgments.  *See*, <u>Gayden v. Nourbakhsh (In re Nourbakhsh)</u>, 67 F.3d 798, 800 (9th Cir. 1995).

1   record as of April 14, 2013 clearly reflects that the amount of any Barton claim was completely

2   uncertain as of that date and that Debtor scheduled the claim properly as a disputed, unliquidated

3   and contingent claim.

4       As far as Debtor's schedule B disclosure of zero value for Debtor's shares in the related

5   RPost companies, this brief will show that this valuation is absolutely proper for two reasons.

6   First, the Debtor's right to transfer the shares is restricted.  Such restrictions are fully enforceable

7   under the Bankruptcy Code.  *See*, <u>Calvert v. Bongards Creameries (In re Schauer)</u>, 835 F.2d 1222

8   (8th Cir. 1987).  Second, there is no effective market for Debtor's shares.  Under either

9   circumstance, Debtor's scheduling of the RPost stock at zero value is in good faith.  If the

10  valuation is ultimately determined differently at confirmation, the impact on plan confirmation

11  will be determined at that time.  However, for purposes of Barton's Motion, the scheduled value is

12  reasonable and in good faith.

13      Barton makes a variety of other miscellaneous arguments, none of which have merit and

14  none of which support converting Debtor's case.  All such arguments are addressed in section V

15  *infra*.  Based on all the foregoing, the Court should *deny* Barton's Motion.

16                                              **II.**

17                  <u>**BARTON IS NOT A PARTY IN INTEREST IN THIS CASE**</u>

18      Barton brings his motion under 11 U.S.C. § 1307(c) which provides that a "party in

19  interest" may request conversion or dismissal of a chapter 13 case.  The term "party in interest" is

20  not defined in chapter 13, but the term is defined in § 1109(b) pertaining to chapter 11 cases as

21  including the debtor, the trustee, a creditor's committee, an equity security holder's committee, a

22  creditor, an equity security holder, or any indenture trustee.  Barton does not address his standing

23  in the Motion and as a preliminary matter, he must establish that he has a sufficient stake in the

24  outcome of the proceeding to warrant his participation as a party in interest.

25      If Barton were a creditor, his standing would be established.  However, Barton's claim is

26  subject to mandatory subordination and disallowance under §§ 510(b) and 502(b)(1).  Perhaps this

27  is why Barton styled his Motion as brought by Barton as a "creditor" and "adversary plaintiff."  If

28  Barton's creditor status fails, perhaps he seeks to rely on his non-dischargeability complaint for

1  standing to seek conversion.  However, Barton does not seek case dismissal, but only conversion.

2  Barton's non-dischargeability litigation will remain pending in any converted case.  In fact, he has

3  expressly requested that his adversary proceeding remain pending.  *See*, Motion at 25 footnote 9.

4  Thus, conversion does not give Barton standing based on his adversary plaintiff status.

5      Under this doctrine of constitutional standing, a plaintiff must adequately establish: (1) an

6  injury in fact (i.e., a concrete and particularized invasion of a legally protected interest); (2)

7  causation (i.e., a fairly traceable connection between the alleged injury in fact and the alleged

8  conduct of the defendant); and (3) redressability (i.e., it is likely and not merely speculative that

9  the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit). Sprint

10  Commc'ns Co. v. APCC Servs., Inc., 554 U.S. 269, 273-74 (2008) (citing Lujan v. Defenders of

11  Wildlife, 504 U.S. 555, 560-61 (1992)). A "particularized" injury means one that affects the

12  plaintiff in a personal and individual way.  Lujan, 504 U.S. at 561 n.1.

13      To the extent Barton's creditor status is eliminated by operation of section 510(b), Barton's

14  adversary plaintiff status does not confer standing because Barton only seeks conversion to

15  chapter 7 and he fully intends to continue prosecuting his non-dischargeability action.  For all

16  these reasons, unless and until Barton establishes creditor status, his Motion must be denied for

17  lack of standing.

18                                         **II.**

19      **BARTON'S CLAIM WAS UNLIQUIDATED AS OF THE PETITION DATE;**

20      **DEBTOR IS ELIGIBLE FOR CHAPTER 13 RELIEF**

21      Barton argues Khan is ineligible for chapter 13 relief because his debt to Barton exceeded

22  the chapter 13 limit as of April 14, 2013.   In fact, at the time he filed his petition, Khan's debt to

23  Barton – based on the LASC lawsuit Barton had filed against Khan -- was fixed at $100,000 and

24  otherwise completely unliquidated.  Since unliquidated debts as of the petition filing date are not

25  included in determining chapter 13 eligibility, Barton is wrong and his Motion must be denied.

26  Furthermore, section 109(e) only refers to "debts" which means "liability on a claim."  *See*, 11

27  U.S.C. § 101(12).  To the extent Barton's claim is subordinated and disallowed, his purported

28  claim cannot impact chapter 13 eligibility.

1       For chapter 13 eligibility purposes, the debtor's obligations are determined as of the

2    petition filing date based on the Debtor's schedules.  *See*, In re Slack, 187 F.3d 1070, 1073 (9th

3    Cir. 1999) ("a bankruptcy court cannot look to post-petition events to determine the amount of the

4    debt") (citations omitted).  An obligation must be liquidated in order to be included in the

5    calculation of debts.  In re Guastella, 341 B.R. 908, 916 (9th Cir. B.A.P. 2006) ("Under §109(e),

6    applicable at the commencement of the bankruptcy case, a debtor is eligible for chapter 13 relief if

7    the sum of his or her noncontingent, liquidated, unsecured debts does not exceed the statutory

8    limit. . . .")  An obligation is liquidated where the existence of the obligation – i.e., the debtor's

9    liability – as well as the amount of that obligation are either fixed or subject to a non-disputed

10    calculation.  *See*, *e.g.*, In re Ho, 274 B.R. 867, (9th Cir. B.A.P. 2002) ("A debt is liquidated if the

11    amount of the debt is readily determinable. . . .  Whether a debt is subject to 'ready determination'

12    depends on whether the amount is easily calculable or whether an extensive hearing is needed to

13    determine the amount of the debt") (quoting In re Slack, 187 F.3d 1070, 1074, citations omitted).

14    Thus, where either the fact of liability or the amount of damages is subject to a contested

15    evidentiary trial, the debt is unliquidated for chapter 13 eligibility.

16       Here, both the fact of Khan being liable for damages as well as the amount of any such

17    damages were unresolved and uncalculable on April 14, 2013.  As of that date, the only certainty

18    was that Khan owed Barton $100,000.  That is why Barton was scheduled on Debtor's schedule F

19    for the liquidated amount of $100,000 (although the amount remains disputed and subject to

20    appeal).  The event that changed the liquidation status occurred on June 18, 2013.

21       Barton skips over the relevant facts of the events between August 2012 and April 2013

22    because a careful review of the procedural history of the LASC litigation confirms that no one

23    knew or could know the results of the LASC proceedings until June 2013.  As of April 14, 2013,

24    the amount of damages Khan owed Barton could have been limited to the $100,000 already found,

25    some small additional amount, or a larger amount.  But whether any of these results would occur

26    were subject to contested evidentiary hearings where no one could determine the outcome.

27    The summary of these facts is as follows:

28

1. In August 2012, the Court found Khan converted Barton's approximately 6 million shares of RPost International Limited ("RIL") common stock and concluded it was impossible to value those shares and ordered RIL return those shares. *See*, RFJN Exhibit A at internal Exhibit 1 (Statement of Decision).

2. In November 2012, following three days of evidentiary hearings concerning punitive damages, the Court stated it was unhappy with the restitution remedy it had imposed and ruled it intended to appoint an independent expert to try to determine a value to the shares. The Court confirmed that if the expert made a value determination, s/he would be subject to examination by the parties to determine whether that determination was reasonable. *See*, RFJN Exhibit B (Excerpt Nov. 26, 2012 LASC transcript).

3. In February 2013, the Court formally appointed the independent expert and charged him with attempting to place a value on the shares. The Court stated the expert would be subject to cross examination by the parties following his issuance of a report and explicitly stated it was free to decide whether to accept the expert's opinion at all, and if so, to what extent: "I want to say clearly Dr. Wazzan is a 730 expert providing assistance to the Court. I may ultimately conclude that what he recommends is appropriate. I may endorse some of what he has to say. I may reject it." *See*, RFJN Exhibit C (Excerpt Feb. 21, 2013 LASC transcript).

4. In March 2013, the independent expert issued a report that concluded the value of Barton's shares was $3,850,050.

5. On April 4, 2013, the expert was cross examined by the parties and examined by the Court as well in a hearing that lasted the entire day, and much of the following day.

6. The expert's testimony demonstrated his opinion of value was based on the back-solve method, a process relying on an option pricing model. The expert repeated what he wrote in his report – that the back-solve method provided "perverse" results because the most important discretionary input to be selected by the expert was the length of time from the valuation date to a liquidation event – an event when the investors in the company would be able to monetize their investments.

7.    The expert testimony also demonstrated that in selecting the time to liquidity for his valuation analysis one year, even though he considered there to be "zero" percent likelihood that RIL would have a liquidity event in that time period and that a much longer time to liquidity event was more factually accurate. It is important to note that this valuation was even in fact retroactive to June 2009, and no liquidity event had happened at the time of the expert's evaluation in March 2013, so it was in fact true that no liquidity event had happened in the one year time period used in the expert's valuation report.

8.    The expert conceded that he had no factually-based justification for selecting one year to liquidity event, and that the only reason he did so was because he concluded the shares must have had some value and therefore one year to liquidity event provided a palatable value.

9.    The expert testified he had performed another valuation methodology – the discounted cash flow ("DCF") method -- and relied upon the results of  his DCF analysis to validate his back-solve results.  During cross-examination, the expert conceded he used erroneous information about RIL's projected income and expenses in performing his DCF analysis and agreed to provide a supplemental report with a new DCF analysis.

10. On April 12, 2013, the expert submitted a supplemental report in which he revised the calculations for an alternative damages methodology based on the cross examination on April 4.  The supplemental report demonstrated that contrary to his original determination of value using this alternative methodology – which showed Barton's shares to be worth exactly half of what he concluded the shares were worth using the back-solve method -- the corrected determination showed those shares had no value.  *See*, RFJN Exhibit D (Wazzan supplemental report dated 4/12/13).

Barton's theory here is that following the April 4, 2013 hearing at which the independent expert was cross examined, all that was left for the Superior Court to do was perform a simple "arithmetic" step.  Nothing could be further from the truth.  The Court had on February 21, 2013 expressly stated it would not automatically adopt the expert's conclusions.  The Court said nothing during the April 4 hearing when the expert was examined to suggest it intended to adopt the

1    expert's conclusion.  Barton cannot point to any document or to a single sentence in that hearing

2    in which the Court said, suggested, or implied that it would adopt the independent expert's value

3    determination.

4              Moreover, the April 4, 2013 hearing was not a simple hearing by any means.  To the

5    contrary, it lasted two days, and both sides as well as the Court, closely questioned the expert.

6    Plaintiff sought to get the expert to increase his determination of the value of the shares, while

7    Defendants sought to get the expert to concede both that his opinion was speculative and that the

8    true value of the shares was zero.

9              Not only did the Court not in any manner indicate what it would do with the expert's

10   opinion, the Court acknowledged the expert's expressed reservations about the back-solve method

11   and that the expert had selected one year for the time to liquidity event even though he believed –

12   as did the Court – there was "zero" likelihood that would occur.  *See*, RFJN Exhibit E (Excerpt

13   Apr. 4, 2013 LASC transcript).

14             In addition, the Court heard the independent expert discuss the alternative methodology he

15   used to validate the results he reached using the back-solve method.  The expert conceded during

16   his examination that the information he used to perform that calculation was factually inaccurate,

17   and agreed to perform that calculation again using the correct information – which resulted in a

18   zero damage number.  Nevertheless, now, with no validation for his back-solve result, the expert

19   still insisted it was valid.

20             As of April 14, 2013, there was no likelihood – much less any certainty – that the Court

21   would adopt the independent expert's value determination.  There was no simple arithmetic the

22   Court needed to perform.  It needed to decide whether to change its mind about the inherent

23   speculative nature of the back-solve method and thus to determine whether to reverse its earlier

24   determination that the only remedy consistent with non-speculative damages analysis was

25   restitution of Barton's alleged shares.  In addition, assuming the Court decided to award damages,

26   it needed to decide whether to accept the independent expert's back-solve calculations or whether

27   to take into consideration the results of the DCF analysis.

28

1    Simply stated, as of April 14, 2013, the Court had the whole range of options it had as it

2    expressed them on February 21, 2013:   "I want to say clearly Dr. Wazzan is a 730 expert

3    providing assistance to the Court.  I may ultimately conclude that what he recommends is

4    appropriate.  I may endorse some of what he has to say.  I may reject it."  *See*, RFJN Exhibit C

5    (Excerpt Feb. 21, 2013 LASC transcript).

6    Since the independent expert's analysis was conceded by the expert and acknowledged by

7    the Court as being based on a fiction with respect to the most crucial input that the expert had

8    discretion to select, the most likely result following the conclusion of the April 4, 2013 hearing

9    was that the Court would not award any damages for the conversion of Barton's shares because

10    there was no non-speculative evidence of what those damages were.  But, in any event, the amount

11    of damages Khan owed Barton – other than the $100,000 for emotional distress – was

12    unliquidated.

13    Barton emphasizes reliance on In re Wenberg as authority for the proposition that Barton's

14    debt was sufficiently liquidated as of April 14, 2013 to render Khan ineligible.  *See*, Motion 10:9-

15    12.  To the contrary, Wenberg proves that Barton's debt was entirely unliquidated.  In Wenberg,

16    the Ninth Circuit adopted the BAP's opinion concerning the "ready determination" of attorney's

17    fees that were submitted but not allowed as of the petition date.  The BAP found:

18    
19    In the instant case, the transcript indicates that the billing statements lumped
together fees incurred in the Texas bankruptcy proceedings which did not involve
the underlying adversary proceeding and were thus outside the scope of the award
of attorneys' fees and costs. However, the bankruptcy court was able to discern the
20    approximate fees for services involving only the adversary proceeding by
questioning the attorneys as to the entries. The transcript indicates that this hearing
21    was not overly extensive. Also, after the bankruptcy court's threshold review of the
subject fees, it implicitly determined that for purposes of § 109(e) the
22    approximately $35,000 accounting fees and $19,000 attorneys' fees were not
subject to a bona fide dispute. Therefore, this Panel is unable to find that the
23    bankruptcy court erred in concluding that the claim for fees was subject to ready
determination.
24    
25    In re Wenberg, 94 B.R. 631, 635 (9th Cir. B.A.P. 1988), *affirmed*, 902 F.2d 768 (9th Cir. 1990).

26    The BAP's finding concerning "ready determination" in Wenberg contrasts sharply against

27    the status of the Barton unliquidated claim herein.  At first, Barton was only entitled to restitution

28

1    of his shares plus $100,000 in emotional distress damages and unspecified punitive damages.  The

2    LASC then reversed course and embarked on a complex effort to determine whether the allegedly

3    converted shares could be valued as of the date of alleged conversion.  The hearings were

4    extensive and the issues extremely complex.  As of April 14, 2013 the Barton claim was

5    unliquidated in any amount other than $100,000.

6        Finally, the Court should also consider the issue of mandatory subordination and

7    disallowance concerning Barton's alleged claim.  If the Barton claim is subordinated and

8    disallowed, then the claim cannot have unsecured "debt" status for purposes of section 109(e).

9    This same defense exists for Barton's allegations concerning other claims emanating from the RIL

10   litigation, such as claims for reimbursement or contribution which are specifically addressed in

11   section 510(b).   For these additional reason, Khan is eligible for chapter 13 relief.

12       Accordingly, Debtor is eligible for chapter 13.  Based on all the foregoing, the Court

13   should *deny* Barton's Motion

14                                        **III.**

15   **DEBTOR'S DISCLOSURE OF ZERO VALUE FOR RPOST ENTITY SHARES**

16                  **IS ACCURATE AND IN GOOD FAITH**

17       In his schedule B, Debtor disclosed zero value for Debtor's shares in RPost International

18   Limited, RMail Limited and RPost Communications, Ltd. (collectively "RPost Entities").  Barton

19   complains that this valuation is in bad faith which supports case conversion.  However, Debtor's

20   scheduled value is absolutely proper because Debtor's right to transfer his shares in the RPost

21   Entities is contractually and legally restricted and there is no effective market for Debtor's shares.

22   Under either circumstance, Debtor's scheduling of the RPost stock at zero value is in good faith.

23       **A. Transfer of the Shares Is Restricted.**

24       For each of Khan's shareholdings in the RPost Entities disclosed on his schedule B, the

25   transfer of Khan's shares is restricted.  Therefore, even if there could be found a permitted buyer

26   of any of the classes of shares noted, despite the fact that there is no market and the shares are not

27   marketable to the public, the Debtor is not authorized to sell as transfer is restricted. Therefore,

28   there is no market for the shares, and the shares could not be liquidated for value.

Khan's shares were issued to Khan as part of incentive agreements to manage the companies. These shares are governed by a Management Agreement that states:

> **Share Transfer Restrictions**. The shares in the Company allotted and/or owned by Officer are restricted from transfer other than to a Permitted Transferee, with such restriction terminating upon the earliest to occur of any one of the following events: (a) The liquidation, dissolution or indefinite cessation of the business operations of the Company; (b) A firm commitment underwritten public offering by the Company of shares pursuant to a registration statement under the Securities Act of 1933, as amended, and which results in aggregate cash proceeds to the Company of $10,000,000 (net of underwriting discounts and commissions); or (c) The sale, conveyance or disposal of all or substantially all of the Company's property or business or the Company's merger with or into or consolidation with any other corporation (other than a wholly-owned subsidiary corporation) or if the Company effects any other transaction or series of related transactions in which more than fifty percent (50%) of the voting power of the Company is disposed of and the Company is not the survivor, provided that this Section shall not apply to a merger effected exclusively for the purpose of changing the domicile of the Company. Each certificate representing shares of the Company now or hereafter owned by the Officer or issued to any Permitted Transferee shall bear the following legend: "THE SALE, PLEDGE, HYPOTHECATION OR TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF A CERTAIN MANAGEMENT AGREEMENT BY AND BETWEEN THE SHAREHOLDER AND THE CORPORATION. COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE CORPORATION." A Permitted Transferee is the Officer's ancestors, descendants or spouse or to a trust for their benefit.

*See*, Management Agreements collectively attached hereto as Exhibit A.

The above transfer restriction is included in the Management Agreements between each of the RPost Entities and the Debtor. The RPost Entities are all Bermuda companies and the restrictions are enforceable under Bermuda law. According to The Bermuda Companies Act, Part XIVA:

> Transfer of Securities, such a transfer restriction is lawful if recorded in an agreement, "272A. Transfer of Securities. (8) The Regulations may include such supplementary, incidental and transitional provisions as appear to the Minister to be necessary or expedient and in particular, provision may be made for the purpose of giving effect to - (b) any restriction on the transfer of title to securities arising by virtue of the provisions of any statutory provision or instrument, court order or agreement;"

Transfer restrictions are also contained in the RPost International Limited Co-Sale agreement Section 2 entitled Transfer Restrictions.  Likewise, transfer restrictions are also contained in the RPost Communications Limited board of directors meeting minutes of February 17, 2011 and so noted in the Restricted Common Share Agreement and Common and Preferred share certificate legends, which both state:

> The shares represented by this Certificate have not been registered under the United States Securities Act of 1933, as amended (the "Act"), or applicable United States' state securities laws or with any other sovereign nation securities administration or laws ("Laws"), and may not be offered, sold or otherwise transferred, pledged or hypothecated unless and until such shares are registered under the Act and/or such Laws as may be required..." and continues, "This Certificate and the shares evidenced by this Certificate are also subject to restrictions on transfer contained in the Bye-Laws of the corporation dated March 2011 and the terms of the Investors' Rights Agreement dated March 2011, and no transfer of this Certificate or such shares shall be made unless the conditions specified in said Bye-Laws and Agreement have been fulfilled and any requirements under the Act and/or Laws are satisfied.

*See*, miscellaneous restrictions collectively attached hereto as Exhibit B.

As set forth above, the Debtor's shares are restricted against transfer.  Such restrictions are fully enforceable under the Bankruptcy Code.  *See*, Calvert v. Bongards Creameries (In re Schauer), 835 F.2d 1222 (8th Cir. 1987).  Thus, the shares cannot be transferred and have no value.  Barton's allegations to the contrary lack foundation and consist of nothing more than speculation.  Debtor scheduled the share value in good faith and Barton's Motion should be denied.

### B. There is no Public Market for the Shares.

In addition to the share transfer restrictions, each of the share issuances for the RPost Entities are in private Bermuda companies.  None of the shares are currently registered securities as would be required for the marketing and sale of the shares to the public.  Registration of the securities would be required under the United States Securities and Exchange Act of 1933 as amended, and the Bermuda Companies Act in order to create any market for such shares.

As of April 14, 2013, only one of the companies in which Khan holds shares had sold shares of the share class that Khan owns; the most recent private sale of Preferred Shares of RPost Communications Limited was at a share price of $5.75 per share.  There have been no sales of

RPost International Limited common shares at above $0.01 per share in more than 10 years or RMail Limited common shares.  Since the company's shares were not and are not registered with any securities authority, such sales were required to be conducted without any public marketing, and only to select accredited investors that had been identified through a pre-existing relationship. The memorandum used for these select individual accredited investors stated on page 5 in capital letters with parts in bold for emphasis:

> NO PUBLIC MARKET EXISTS FOR ANY OF THE COMPANY'S SECURITIES, INCLUDING THE STANDARD PREFERRED SHARES, AND NO PUBLIC MARKET IS  EXPECTED TO DEVELOP AFTER THIS OFFERING.  THE STANDARD PREFERRED SHARES AND ANY COMMON SHARES ISSUABLE UPON CONVERSION OF THE STANDARD PREFERRED SHARES WILL BE SUBJECT TO RESTRICTIONS AND MAY NOT BE RESOLD OR TRANSFERRED EXCEPT THROUGH REGISTRATION OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS.
> ….
> THE STANDARD PREFERRED SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR ANY APPLICABLE STATE SECURITIES LAWS.
> ….
> THE SECURITIES ARE EXEMPT FROM REGISTRATION UNDER REGULATION D AND/OR SECTION 4(2) OF THE SECURITIES ACT, AND SIMILAR EXEMPTIONS FROM REGISTRATION PROVIDED BY CERTAIN STATE SECURITIES LAWS.  REGULATION D SETS FORTH CERTAIN RESTRICTIONS AS TO THE NUMBER AND NATURE OF PURCHASERS OF SECURITIES OFFERED PURSUANT THERETO. RCOM HAS ELECTED TO OFFER SECURITIES ONLY TO ACCREDITED INVESTORS AS SET FORTH IN RULE 501(A) OF REGULATION D AND THEREFORE EACH INVESTOR IN THE CONTEMPLATED OFFERING MAY BE REQUIRED TO AGAIN MAKE REPRESENTATIONS AS TO THE BASIS UPON WHICH HE OR SHE QUALIFIES AS AN ACCREDITED INVESTOR."

*See*, Exhibit C hereto.

In addition to there being no public market for the RCom preferred shares, there is no secondary market for the shares.  There have not been, to the Company's knowledge, any private sales of its preferred shares at any time.  The fact that RCom sells preferred shares in private placements to accredited investors at a specific price does not equate to a value on the shares held by any of those private investors, because there is no market (public or secondary) and because the shares are highly speculative.  An investor might buy in for $5.75, but that investor is then locked

1    in until some unknown future development.  This means, contrary to Barton's allegation, that

2    Khan's shares cannot be valued based on the price investors pay for new shares.

3         Based on all the foregoing, Khan disclosed a zero valuation for his shares in the RPost

4    entities.  This valuation is clearly in good faith and based on reasonable assumptions as to

5    marketability and restrictions on transfer.  For all these reasons, Barton's Motion should be

6    denied.

7                                              **IV.**

8    **BARTON'S MISCELLAENOUS ARGUMENTS FAIL AND DO NOT SUPPORT**

9    **CONVERSION BASED THE TOTALITY OF CIRCUMSTANCES OR BAD FAITH**

10        Although Barton's Motion is primarily based on chapter 13 eligibility and Debtor's zero

11   valuation for the RPost shares, Barton engages in shotgun pleading and asserts a variety of other

12   alleged claims in order the obfuscate the record and create an appearance of bad faith.  However,

13   none of these claims supports conversion based on bad faith as follows:

14        1.    Barton's first miscellaneous argument is that Debtor was not insolvent on the

15   petition date because Debtor claimed $315,000 in net worth in LASC papers and Barton's

16   liquidated claim was only $100,000.  Motion 22-23.  This argument of course undercuts Barton's

17   own claim that his Judgment was liquidated as of the petition date.  However, Barton attempts to

18   use this point to make the disjointed argument that Debtor filed his petition solely for the improper

19   purpose of frustrating the LASC proceedings without a legitimate reorganization purpose.  The

20   argument is ludicrous and fully rebutted by the fact that within nine (9) days of filing his chapter

21   13 case, the Debtor stipulated with Barton to relieve the stay to permit the conclusion of the LASC

22   proceedings.  *See*, RFJN Exhibit F.  The Debtor's agreement to relieve the stay to permit

23   conclusion of the LASC proceeding evidences no intent to frustrate the course of the state court

24   proceedings.

25        2.    Barton's second miscellaneous argument is that the Debtor filed a "deliberately

26   hurried plan" in a bad faith attempt to confirm a plan while misrepresenting assets.  Motion 24:1-

27   10.  Apparently, Barton believes the Debtor had a choice to file a plan when he did.  Barton's

28   argument seeks to transmute ordinary chapter 13 compliance into bad faith.  Local Bankruptcy

-14-

1   Rule 3015-1(b), the chapter 13 plan must be filed within 14 days of the petition date.  The plan

2   sets the chapter 13 trustee's plan payment requirement which must then be maintained throughout

3   the case.  The Debtor complied with this obligation and has timely funded $900 monthly to the

4   chapter 13 trustee.  Barton has suffered no prejudice by virtue of the chapter 13 plan process.  The

5   first confirmation hearing in this case is set for February 10, 2014 at 9:00 a.m.  The plan process

6   has not resulted in any prejudice for Barton.  And contrary to Barton's argument, conversion will

7   certainly not result in any earlier distribution to Barton.

8          3.      Barton's third miscellaneous argument is that $60,000,000 in sham claims filed by

9   alleged creditors Burke, 126736 Canada, Inc. and George Martin ("Burke Claims") somehow

10  render the Debtor ineligible for chapter 13 relief.  The Burke Claims are completely unliquidated,

11  and disputed two page claim forms, the attachment to which admits the unliquidated nature thereof

12  because it "requires an accounting"  and are based on adversary proceeding number 2:13-ap-

13  01773-VZ pending before the Court.  *See*, RFJN Exhibit G.  Debtor has already moved to dismiss

14  the Burke complaint on the grounds of standing and Burke filed a first amended complaint.

15  Debtor is certain these claims will be disallowed and/or also subject to §510(b) subordination.

16         4.      Barton's fourth miscellaneous argument is that Debtor has failed to address chapter

17  13 Trustee inquiries.  Barton has little cause to complain about the Debtor's exchanges with the

18  Trustee in which the Debtor has provided thousands of pages of information to the Trustee.  To

19  the extent of any Trustee joinder, Debtor will respond to such issues in accordance with the Local

20  Bankruptcy Rules.

**V.**

**CONCLUSION**

23       Based on all the foregoing, the Debtor requests that the Court *deny* Barton's Motion and

24  grant such other and further relief as is just and proper under the circumstances.

25  Dated:  September 23, 2013               **Horgan, Rosen, Beckham & Coren, LLP**
                                          **Lewis R. Landau**

26

27                                    By:*/s/ Lewis R. Landau*
                                     Lewis R. Landau

28                                       Attorneys for Debtor

# DECLARATION OF ZAFAR DAVID KHAN

I, Zafar David Khan, do hereby declare:

1.      I am the chapter 13 debtor ("Debtor") in chapter 13 case number 2:13-bk-19713 VZ pending before the United States Bankruptcy Court for the Central District of California.  I have personal knowledge of the facts set forth herein.  On April 14, 2013 I commenced my chapter 13 bankruptcy case by filing a voluntary chapter 13 petition.

2.      I filed my chapter 13 case with honesty and good intentions to reorganize my debts. I filed a chapter 13 plan committing to pay $54,000 to creditors over five years.  I have paid $900 monthly to the Trustee since the commencement of my case to comply with my plan.

3.      Barton and I have been engaged in our current litigation since 2010.  The litigation resulted in an August 30, 2013 judgment in Los Angeles Superior Court ("LASC") case number YC061581 against RPost International Limited ("RIL"), other defendants including related debtor Terrance A. Tomkow ("Tomkow") and myself.  *See*, RFJN Exhibit A at internal Exhibit 2 thereto ("Judgment").  As set forth in the Judgment, Barton's claim amount was liquidated by the LASC in the sum of $4,070,081.91.  On September 19, 2013 I timely appealed the Judgment and the matter remains pending on appeal.  *See*, RFJN Exhibit A at internal Exhibit 3 thereto consisting of a true and correct copy of my Notice of Appeal filed September 19, 2013.

4.      As of my April 14, 2013 petition date, the amount of damages I owed Barton could have been limited to the $100,000 already found, some small additional amount, or a larger amount.  In August 2012, the Court found that I converted Barton's approximately 6 million shares of RPost International Limited ("RIL") common stock and concluded it was impossible to value those shares and ordered RIL return those shares.  *See*, RFJN Exhibit A at internal Exhibit 1 (Statement of Decision).

5.      In November 2012, following three days of evidentiary hearings concerning punitive damages, the Court stated it was unhappy with the restitution remedy it had imposed and ruled it intended to appoint an independent expert to try to determine a value to the shares.  The Court confirmed that if the expert made a value determination, s/he would be subject to

1   examination by the parties to determine whether that determination was reasonable.  *See*, RFJN

2   Exhibit B consisting of a true and correct excerpt of the November 26, 2012 LASC hearing.

3          6.      In February 2013, the Court formally appointed the independent expert and charged

4   him with attempting to place a value on the shares.  The Court stated the expert would be subject

5   to cross examination by the parties following his issuance of a report and explicitly stated it was

6   free to decide whether to accept the expert's opinion at all, and if so, to what extent:  "I want to

7   say clearly Dr. Wazzan is a 730 expert providing assistance to the Court.  I may ultimately

8   conclude that what he recommends is appropriate.  I may endorse some of what he has to say.  I

9   may reject it."  *See*, RFJN Exhibit C consisting of a true and correct excerpt of the February 21,

10   2013 LASC transcript.

11          7.      In March 2013, the independent expert issued a report that concluded the value of

12   Barton's shares was $3,850,050.  On April 4, 2013, the expert was cross examined by the parties

13   and examined by the Court as well in a hearing that lasted the entire day, and much of the

14   following day.  The expert's testimony demonstrated his opinion of value was based on the back-

15   solve method, a process relying on an option pricing model.  The expert repeated what he wrote in

16   his report – that the back-solve method provided "perverse" results because the most important

17   discretionary input to be selected by the expert was the length of time from the valuation date to a

18   liquidation event – an event when the investors in the company would be able to monetize their

19   investments.

20          8.      The expert testimony also demonstrated that in selecting the time to liquidity for his

21   valuation analysis one year, even though he considered there to be "zero" percent likelihood that

22   RIL would have a liquidity event in that time period and that a much longer time to liquidity event

23   was more factually accurate. It is important to note that this valuation was even in fact retroactive

24   to June 2009, and no liquidity event had happened at the time of the expert's evaluation in March

25   2013, so it was in fact true that no liquidity event had happened in the one year time period used in

26   the expert's valuation report.

27          9.      The expert conceded that he had no factually-based justification for selecting one

28   year to liquidity event, and that the only reason he did so was because he concluded the shares

must have had some value and therefore one year to liquidity event provided a palatable value. The expert testified he had performed another valuation methodology – the discounted cash flow ("DCF") method -- and relied upon the results of his DCF analysis to validate his back-solve results. During cross-examination, the expert conceded he used erroneous information about RIL's projected income and expenses in performing his DCF analysis and agreed to provide a supplemental report with a new DCF analysis.

10. On April 12, 2013, the expert submitted a supplemental report in which he revised the calculations for an alternative damages methodology based on the cross examination on April 4. The supplemental report demonstrated that contrary to his original determination of value using this alternative methodology – which showed Barton's shares to be worth exactly half of what he concluded the shares were worth using the back-solve method -- the corrected determination showed those shares had no value. *See*, RFJN Exhibit D consisting of a true and correct excerpt of the Wazzan supplemental report dated April 12, 2013.

11. After the expert's testimony, the Court did not in any manner indicate what it would do with the expert's opinion. The Court acknowledged the expert's expressed reservations about the back-solve method and that the expert had selected one year for the time to liquidity event even though he believed – as did the Court – there was "zero" likelihood that would occur. *See*, RFJN Exhibit E consisting of a true and correct excerpt of the April 4, 2013 LASC transcript.

12. In addition, the Court heard the independent expert discuss the alternative methodology he used to validate the results he reached using the back-solve method. The expert conceded during his examination that the information he used to perform that calculation was factually inaccurate, and agreed to perform that calculation again using the correct information – which resulted in a zero damage number. Nevertheless, now, with no validation for his back-solve result, the expert still insisted it was valid.

13. As of April 14, 2013, there was no likelihood – much less any certainty – that the Court would adopt the independent expert's value determination. There was no simple arithmetic the Court needed to perform. It needed to decide whether to change its mind about the inherent speculative nature of the back-solve method and thus to determine whether to reverse its earlier

1    determination that the only remedy consistent with non-speculative damages analysis was

2    restitution of Barton's alleged shares.  In addition, assuming the Court decided to award damages,

3    it needed to decide whether to accept the independent expert's back-solve calculations or whether

4    to take into consideration the results of the DCF analysis.

5           14.     I further stand by my zero dollar valuation for shares on my schedule B.  For each

6    of my shareholdings in the RPost Entities disclosed on my schedule B, the transfer of my shares is

7    restricted.  Therefore, even if there could be found a permitted buyer of any of the classes of

8    shares noted, despite the fact that there is no market and the shares are not marketable to the

9    public, I am not authorized to sell as transfer is restricted. Therefore, there is no market for the

10    shares, and the shares could not be liquidated for value.

11           15.     My shares were issued to me as part of incentive agreements to manage the

12    companies.  These shares are governed by a Management Agreement that states:

13    **Share Transfer Restrictions**. The shares in the Company allotted and/or

14    owned by Officer are restricted from transfer other than to a Permitted Transferee, with such restriction terminating upon the earliest to occur of any one of the

15    following events: (a) The liquidation, dissolution or indefinite cessation of the business operations of the Company; (b) A firm commitment underwritten public

16    offering by the Company of shares pursuant to a registration statement under the Securities Act of 1933, as amended, and which results in aggregate cash proceeds

17    to the Company of $10,000,000 (net of underwriting discounts and commissions); or (c) The sale, conveyance or disposal of all or substantially all of the Company's

18    property or business or the Company's merger with or into or consolidation with any other corporation (other than a wholly-owned subsidiary corporation) or if the

19    Company effects any other transaction or series of related transactions in which

20    more than fifty percent (50%) of the voting power of the Company is disposed of and the Company is not the survivor, provided that this Section shall not apply to a

21    merger effected exclusively for the purpose of changing the domicile of the Company. Each certificate representing shares of the Company now or hereafter

22    owned by the Officer or issued to any Permitted Transferee shall bear the following legend: "THE SALE, PLEDGE, HYPOTHECATION OR TRANSFER OF THE

23    SECURITIES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF A CERTAIN MANAGEMENT AGREEMENT

24    BY AND BETWEEN THE SHAREHOLDER AND THE CORPORATION. COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN

25    REQUEST TO THE SECRETARY OF THE CORPORATION." A Permitted

26    Transferee is the Officer's ancestors, descendants or spouse or to a trust for their benefit.

27

28

1    True and correct copies of the Management Agreements for  RPost International Limited, RMail

2    Limited and RPost Communications, Ltd. (collectively "RPost Entities") currently in force and

3    effect are attached hereto as Exhibit A.

4            16.    The above transfer restriction is included in the Management Agreements between

5    each of the RPost Entities and me.  The RPost Entities are all Bermuda companies and the

6    restrictions are enforceable under Bermuda law

7            17.    Transfer restrictions are also contained in the RPost International Limited Co-Sale

8    agreement Section 2 entitled Transfer Restrictions.  Likewise, transfer restrictions are also

9    contained in the RPost Communications Limited board of directors meeting minutes of February

10   17, 2011 and so noted in the Restricted Common Share Agreement and Common and Preferred

11   share certificate legends.  True and correct copies of the documents evidencing these additional

12   share transfer restrictions are collectively attached hereto as Exhibit B.

13           18.    In addition to the share transfer restrictions, each of the share issuances for the

14   RPost Entities are in private Bermuda companies.  None of the shares are currently registered

15   securities as would be required for the marketing and sale of the shares to the public.  Registration

16   of the securities would be required under the United States Securities and Exchange Act of 1933

17   as amended, and the Bermuda Companies Act in order to create any market for such shares.

18           19.    As of April 14, 2013, only one of the companies in which I hold shares had sold

19   shares of the share class that I own; the most recent private sale of Preferred Shares of RPost

20   Communications Limited was at a share price of $5.75 per share.  There have been no sales of

21   RPost International Limited common shares at above $0.01 per share in more than 10 years or

22   RMail Limited common shares.  Since the company's shares were not and are not registered with

23   any securities authority, such sales were required to be conducted without any public marketing,

24   and only to select accredited investors that had been identified through a pre-existing relationship.

25   The memorandum used for these select individual accredited investors stated on page 5 contains

26   the notice a true and correct copy of which is attached hereto as Exhibit C.

27           20.    In addition to there being no public market for the RCom preferred shares, there is

28   no secondary market for the shares.  There have not been, to the my knowledge, any private sales

of its preferred shares at any time.  The fact that RCom sells preferred shares in private placements

to accredited investors at a specific price does not equate to a value on the shares held by any of

those private investors, because there is no market (public or secondary) and because the shares

are highly speculative.  An investor might buy in for $5.75, but that investor is then locked in until

some unknown future development.  This means, contrary to Barton's allegation, that my shares

cannot be valued based on the price investors pay for new shares.

21.    Based on all the foregoing, I disclosed a zero valuation for my shares in the RPost

entities based on my good faith belief and based on reasonable assumptions as to marketability

and restrictions on transfer.

22.    I have reviewed the claims filed by alleged creditors Burke, 126736 Canada, Inc.

and George Martin ("Burke Claims").  The Burke Claims are completely unliquidated, and

disputed two page claim forms, the attachment to which admits the unliquidated nature thereof

because it "requires an accounting"  and are based on adversary proceeding number 2:13-ap-

01773-VZ pending before the Court.  *See*, true and correct copies of these claims attached as

RFJN Exhibit G. I have already moved to dismiss the Burke complaint on the grounds of standing

and Burke filed a first amended complaint.  I am certain these specious claims will be disallowed

and/or also subject to §510(b) subordination.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct to the best of my knowledge and belief.

Executed this 23rd day of September, 2013 at Los Angeles, California.

_____
Zafar David Khan

# EXHIBIT A

# MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT (this "Agreement"), dated as of **October 28, 2008,** by and between RMail Limited, a Bermuda Corporation (the "Company"), and **Zafar Khan** (the "Officer"):

## W I T N E S S E T H:

WHEREAS, the Company desires to secure the benefits of the Officer's knowledge, experience and services; and

WHEREAS, the Company desires to contract with the Officer on the terms and conditions set forth below, and the Officer desires to be so contracted by the Company;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants, representations, agreements, and promises set forth herein, and intending to be legally bound, the parties agree as follows:

1. <u>Management Agreement</u>.

    1.1    <u>Position; Duties</u>. The Company agrees to contract with the Officer as ***Vice President***, and the Officer agrees to accept such contract. The Officer acknowledges that the Officer's title and duties may be changed by the Company from time to time as determined by the Company in its sole discretion, and shall initially be as described in Exhibit A.

    1.2    <u>Nature of Contract</u>. The Company and the Officer agree that the Officer's contract may be terminated by the Company or by the Officer at any time. The Company and the Officer acknowledge that neither this Agreement, nor any of the Company's other policies, procedures or practices, nor any statement or representation by any officer or Officer of the Company, shall be construed as a services contract of the Officer for a specified period of time.

2. <u>Compensation and Related Matters</u>.

    2.1    <u>Fee</u>. As Compensation for services rendered hereunder, the Officer shall serve initially with no cash Compensation. The Compensation may be adjusted by the Company from time to time in the Company's sole discretion.

    2.2    <u>Bonus Plan</u>. The Officer shall not be entitled to any guaranteed bonus for any year and the amount of any bonus shall be in the Company's sole discretion.

1

2.3    Reimbursement.  The Company shall reimburse the Officer for necessary travel and other out-of-pocket expenses incurred by the Officer in the discharge of his duties on behalf of the Company.

3.    Compensation Upon Termination.  In the event the Officer's contract hereunder shall be terminated by the Company, the Company shall pay to the Officer all accrued but unpaid amounts of the Compensation, if any, to which the Officer was entitled as of the date of termination.  Except as provided in this Section 3, the Company shall have no further obligations to the Officer following termination of his contract.

4.    Restrictive Covenants.

4.1    Confidential Information.  The Officer shall hold in a fiduciary capacity for the benefit of the Company all secret or confidential information, knowledge or data relating to the Company or any of its affiliated companies, and their respective businesses, which shall not be or become public knowledge (other than by acts by the Officer or his representatives, in violation of this Agreement).  After termination of the Officer's contract with the Company, he shall not, without the prior written consent of the Company, or as may otherwise be required by law or legal process, communicate or divulge any such information, knowledge or data to anyone other than the Company and those designated by it in writing.  Furthermore, upon termination of this Agreement, the Officer will promptly deliver to the Company all books, memoranda, records and written data of every kind relating to the business and affairs of the Company that may then be in his personal possession.

4.2    Inventions.  The Company acknowledges that the Officer is not contributing to any development of intellectual property on behalf of Company and therefore agrees that no processes, technologies or inventions, including new contributions, improvements, ideas, discoveries, trademarks and trade names, conceived, developed, invented, made or found by the Officer, alone or with others, during his contract with the Company, whether or not patentable and whether or not conceived, developed, invented, made or found on the Company's time or with the use of the Company's facilities or materials (collectively "Inventions"), shall be the property of the Company.

4.3    Share Transfer Restrictions.  The shares in the Company allotted and/or owned by Officer are restricted from transfer other than to a Permitted Transferee, with such restriction terminating upon the earliest to occur of any one of the following events: (a) The liquidation, dissolution or indefinite cessation of the business operations of the Company; (b) A firm commitment underwritten public offering by the Company of shares pursuant to a registration statement under the Securities Act of 1933, as amended, and which results in aggregate cash proceeds to the Company of $10,000,000 (net of underwriting discounts and commissions); or (c) The sale, conveyance or disposal of all or substantially all of the Company's property or business or the Company's merger with or into or consolidation with any other corporation (other than a wholly-owned subsidiary corporation) or if the Company effects

2

**24**

any other transaction or series of related transactions in which more than fifty percent (50%) of the voting power of the Company is disposed of and the Company is not the survivor, provided that this Section shall not apply to a merger effected exclusively for the purpose of changing the domicile of the Company. Each certificate representing shares of the Company now or hereafter owned by the Officer or issued to any Permitted Transferee shall bear the following legend: "THE SALE, PLEDGE, HYPOTHECATION OR TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF A CERTAIN MANAGEMENT AGREEMENT BY AND BETWEEN THE SHAREHOLDER AND THE CORPORATION. COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE CORPORATION." A Permitted Transferee is the Officer's ancestors, descendants or spouse or to a trust for their benefit.

4.4   Death or Total Disability of Officer. If Officer dies or becomes totally disabled during the term of this Agreement, Officer's contract under this Agreement shall automatically terminate.

4.5   Survival. The covenants contained in this Section 4 shall survive any termination of the Officer's services.

5.   Arbitration. Any dispute arising under or in connection with any matter related to this Agreement or any related agreement shall be resolved exclusively by arbitration, provided that the Company shall not be required to arbitrate any dispute as to which the Company seeks equitable relief.

6.   Miscellaneous.

6.1   Successors and Assigns; Binding Agreement. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns; provided, however, that the duties of the Officer hereunder are personal to the Officer and may not be delegated or assigned by him.

6.2   Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the Nation of Bermuda without regard to choice of law rules thereof.

6.3   Waivers. The waiver by either party hereto of any right hereunder of any failure to perform or breach by the other party hereto shall not be deemed a waiver of any other right hereunder or of any other failure or breach by the other party hereto, whether of the same or a similar nature or otherwise. No waiver shall be deemed to have occurred unless set forth in a writing executed by or on behalf of the waiving party. No such written waiver shall be deemed a continuing waiver unless specifically stated therein, and each such waiver shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

3

6.4 <u>Severability</u>. If for any reason any term or provision of this Agreement is held to be invalid or unenforceable, all other valid terms and provisions hereof shall remain in full force and effect, and all of the terms and provisions of this Agreement shall be deemed to be severable in nature.

6.5 <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties hereto, and supersedes all prior oral and/or written understandings and/or agreements between the parties hereto. This Agreement shall serve as termination and cancellation of all prior written and verbal employment, consulting, and/or advisory agreements and understanding by and between the parties hereto.

6.6 <u>Descriptive Headings</u>. The parties hereto agree that the headings of the several paragraphs of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

6.7 <u>No Strict Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any person.

IN WITNESS WHEREOF, each of the parties hereto has caused this Management Agreement to be executed on its behalf on the date first indicated above.

OFFICER:                                RMAIL LIMITED

By:
Name: Terrance Tomkow
Title: Officer

Exhibit A.

Duties: Serve at the direction of the Board of Directors.

4

## MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT (this "Agreement"), dated as of **February 17, 2011**, by and between RPost Communications Limited, a Bermuda Corporation (the "Company"), and **Zafar Khan** (the "Officer"):

### W I T N E S S E T H:

WHEREAS, the Company desires to secure the benefits of the Officer's knowledge, experience and services; and

WHEREAS, the Company desires to contract with the Officer on the terms and conditions set forth below, and the Officer desires to be so contracted by the Company;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants, representations, agreements, and promises set forth herein, and intending to be legally bound, the parties agree as follows:

1. <u>Management Agreement</u>.

    1.1   <u>Position; Duties</u>.  The Company agrees to contract with the Officer as ***Chief Executive Officer***, and the Officer agrees to accept such contract. The Officer acknowledges that the Officer's title and duties may be changed by the Company from time to time as determined by the Company in its sole discretion.

    1.2   <u>Nature of Contract</u>.  The Company and the Officer agree that the Officer's contract may be terminated by the Company or by the Officer at any time. The Company and the Officer acknowledge that neither this Agreement, nor any of the Company's other policies, procedures or practices, nor any statement or representation by any officer or Officer of the Company, shall be construed as a services contract of the Officer for a specified period of time.

2. <u>Compensation and Related Matters</u>.

    2.1   <u>Fee</u>.  As Compensation for services rendered hereunder, the Officer shall serve initially with no cash Compensation. The Compensation may be adjusted by the Company from time to time in the Company's sole discretion.

    2.2   <u>Bonus Plan</u>.  The Officer shall not be entitled to any guaranteed bonus for any year and the amount of any bonus shall be in the Company's sole discretion.

2.3    Reimbursement.  The Company shall reimburse the Officer for necessary travel and other out-of-pocket expenses incurred by the Officer in the discharge of his duties on behalf of the Company.

3.    Compensation Upon Termination.  In the event the Officer's contract hereunder shall be terminated by the Company, the Company shall pay to the Officer all accrued but unpaid amounts of the Compensation, if any, to which the Officer was entitled as of the date of termination.  Except as provided in this Section 3, the Company shall have no further obligations to the Officer following termination of his contract.

4.    Restrictive Covenants.

4.1    Confidential Information.  The Officer shall hold in a fiduciary capacity for the benefit of the Company all secret or confidential information, knowledge or data relating to the Company or any of its affiliated companies, and their respective businesses, which shall not be or become public knowledge (other than by acts by the Officer or his representatives in violation of this Agreement).  After termination of the Officer's contract with the Company, he shall not, without the prior written consent of the Company, or as may otherwise be required by law or legal process, communicate or divulge any such information, knowledge or data to anyone other than the Company and those designated by it in writing.  Furthermore, upon termination of this Agreement, the Officer will promptly deliver to the Company all books, memoranda, records and written data of every kind relating to the business and affairs of the Company that may then be in his personal possession.

4.2    Inventions.  All enhancements developed by Officer that are implemented within the Registered Email® system shall be owned by RPost Communications Limited

4.3    Share Transfer Restrictions.  The shares in the Company allotted and/or owned by Officer are restricted from transfer other than to a Permitted Transferee, with such restriction terminating upon the earliest to occur of any one of the following events: (a) The liquidation, dissolution or indefinite cessation of the business operations of the Company; (b) A firm commitment underwritten public offering by the Company of shares pursuant to a registration statement under the Securities Act of 1933, as amended, and which results in aggregate cash proceeds to the Company of $10,000,000 (net of underwriting discounts and commissions); or (c) The sale, conveyance or disposal of all or substantially all of the Company's property or business or the Company's merger with or into or consolidation with any other corporation (other than a wholly-owned subsidiary corporation) or if the Company effects any other transaction or series of related transactions in which more than fifty percent (50%) of the voting power of the Company is disposed of and the Company is not the survivor, provided that this Section shall not apply to a merger effected exclusively for the purpose of changing the domicile of the Company. Each certificate representing shares of the Company now or hereafter owned by the Officer or issued to any Permitted Transferee shall bear the following legend: "THE SALE, PLEDGE, HYPOTHECATION OR TRANSFER OF THE SECURITIES

2

REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND
CONDITIONS OF A CERTAIN MANAGEMENT AGREEMENT BY AND BETWEEN THE
SHAREHOLDER AND THE CORPORATION. COPIES OF SUCH AGREEMENT MAY BE
OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE
CORPORATION." A Permitted Transferee is the Officer's ancestors, descendants or spouse or
to a trust for their benefit.

       4.4     <u>Death or Total Disability of Officer.</u>  If Officer dies or becomes totally
disabled during the term of this Agreement, Officer's contract under this Agreement shall
automatically terminate.

       4.5     <u>Survival</u>.  The covenants contained in this Section 4 shall survive any
termination of the Officer's services.

       4.6     <u>Irreparable Injury</u>.  The Officer acknowledges that the covenants
contained in this Section 4 are of a special and unique character, which give such covenants a
peculiar value to the Company, the loss of which may not be reasonably or adequately
compensated for by damages in an action at law, and that a material breach or threatened breach
by him of any of the covenants contained in this Section 4 will cause the Company irreparable
injury.  The Officer therefore agrees that the Company shall be entitled, in addition to any other
right or remedy, to a temporary, preliminary and permanent injunction, without the necessity of
proving the inadequacy of monetary damages or the posting of any bond or security, enjoining or
restraining the Officer from any such violation or threatened violation.

    5.    <u>Arbitration</u>.

Any dispute arising under or in connection with any matter related to this Agreement or any
related agreement shall be resolved exclusively by arbitration, provided that the Company shall
not be required to arbitrate any dispute as to which the Company seeks equitable relief.

    6.    <u>Miscellaneous</u>.

       6.1     <u>Successors and Assigns; Binding Agreement</u>.  This Agreement shall be
binding upon and shall inure to the benefit of the parties hereto and their respective heirs,
personal representatives, successors and assigns; <u>provided</u>, <u>however</u>, that the duties of the
Officer hereunder are personal to the Officer and may not be delegated or assigned by him.

       6.2     <u>Governing Law</u>.  This Agreement shall be governed by and construed in
accordance with the laws of the Nation of Bermuda without regard to choice of law rules thereof.

       6.3     <u>Waivers</u>.  The waiver by either party hereto of any right hereunder of any
failure to perform or breach by the other party hereto shall not be deemed a waiver of any other
right hereunder or of any other failure or breach by the other party hereto, whether of the same or

3

a similar nature or otherwise. No waiver shall be deemed to have occurred unless set forth in a writing executed by or on behalf of the waiving party. No such written waiver shall be deemed a continuing waiver unless specifically stated therein, and each such waiver shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

6.4   Severability. If for any reason any term or provision of this Agreement is held to be invalid or unenforceable, all other valid terms and provisions hereof shall remain in full force and effect, and all of the terms and provisions of this Agreement shall be deemed to be severable in nature.

6.5   Entire Agreement. This Agreement constitutes the entire agreement between the parties hereto, and supersedes all prior oral and/or written understandings and/or agreements between the parties hereto. This Agreement shall serve as termination and cancellation of all prior written and verbal employment, consulting, and/or advisory agreements and understanding by and between the parties hereto.

6.6   Descriptive Headings. The parties hereto agree that the headings of the several paragraphs of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

6.7   No Strict Construction. The language used in this Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any person.

IN WITNESS WHEREOF, each of the parties hereto has caused this Management Agreement to be executed on its behalf on the date first indicated above.

OFFICER:                                           RPOST COMMUNICATIONS LIMITED

_____                    By: _____
                                                      Name: Terrance Tomkow
                                                      Title:   Officer

4

30

## MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT (this "Agreement"), dated as of **March 21, 2011**, by and between RPost International Limited, a Bermuda Corporation (the "Company"), and **Zafar Khan** (the "Officer"):

## W I T N E S S E T H:

WHEREAS, the Company desires to secure the benefits of the Officer's knowledge, experience and services; and

WHEREAS, the Company desires to contract with the Officer on the terms and conditions set forth below, and the Officer desires to be so contracted by the Company;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants, representations, agreements, and promises set forth herein, and intending to be legally bound, the parties agree as follows:

1.    Management Agreement.

    1.1    Position; Duties.  The Company agrees to contract with the Officer as *Chief Executive Officer*, and the Officer agrees to accept such contract. The Officer acknowledges that the Officer's title and duties may be changed by the Company from time to time as determined by the Company in its sole discretion, and shall initially be as described in Exhibit A.

    1.2    Nature of Contract.  The Company and the Officer agree that the Officer's contract may be terminated by the Company or by the Officer at any time. The Company and the Officer acknowledge that neither this Agreement, nor any of the Company's other policies, procedures or practices, nor any statement or representation by any officer or Officer of the Company, shall be construed as a services contract of the Officer for a specified period of time.

2.    Compensation and Related Matters.

    2.1    Fee.  As Compensation for services rendered hereunder, the Officer shall serve initially with no cash Compensation. The Compensation may be adjusted by the Company from time to time in the Company's sole discretion.

    2.2    Bonus Plan.  The Officer shall not be entitled to any guaranteed bonus for any year and the amount of any bonus shall be in the Company's sole discretion.

2.3    Reimbursement.  The Company shall reimburse the Officer for necessary travel and other out-of-pocket expenses incurred by the Officer in the discharge of his duties on behalf of the Company.

3.    Compensation Upon Termination.  In the event the Officer's contract hereunder shall be terminated by the Company, the Company shall pay to the Officer all accrued but unpaid amounts of the Compensation, if any, to which the Officer was entitled as of the date of termination.  Except as provided in this Section 3, the Company shall have no further obligations to the Officer following termination of his contract.

4.    Restrictive Covenants.

4.1    Confidential Information.  The Officer shall hold in a fiduciary capacity for the benefit of the Company all secret or confidential information, knowledge or data relating to the Company or any of its affiliated companies, and their respective businesses, which shall not be or become public knowledge (other than by acts by the Officer or his representatives in violation of this Agreement).  After termination of the Officer's contract with the Company, he shall not, without the prior written consent of the Company, or as may otherwise be required by law or legal process, communicate or divulge any such information, knowledge or data to anyone other than the Company and those designated by it in writing.  Furthermore, upon termination of this Agreement, the Officer will promptly deliver to the Company all books, memoranda, records and written data of every kind relating to the business and affairs of the Company that may then be in his personal possession.

4.2    Inventions. The Company acknowledges that the Officer is not contributing to any development of intellectual property on behalf of Company and therefore agrees that no processes, technologies or inventions, including new contributions, improvements, ideas, discoveries, trademarks and trade names, conceived, developed, invented, made or found by the Officer, alone or with others, during his contract with the Company, whether or not patentable and whether or not conceived, developed, invented, made or found on the Company's time or with the use of the Company's facilities or materials (collectively "Inventions"), shall be the property of the Company.

4.3    Share Transfer Restrictions. The shares in the Company allotted and/or owned by Officer are restricted from transfer other than to a Permitted Transferee, with such restriction terminating upon the earliest to occur of any one of the following events: (a) The liquidation, dissolution or indefinite cessation of the business operations of the Company; (b) A firm commitment underwritten public offering by the Company of shares pursuant to a registration statement under the Securities Act of 1933, as amended, and which results in aggregate cash proceeds to the Company of $10,000,000 (net of underwriting discounts and commissions); or (c) The sale, conveyance or disposal of all or substantially all of the Company's property or business or the Company's merger with or into or consolidation with any other corporation (other than a wholly-owned subsidiary corporation) or if the Company effects

2

any other transaction or series of related transactions in which more than fifty percent (50%) of the voting power of the Company is disposed of and the Company is not the survivor, provided that this Section shall not apply to a merger effected exclusively for the purpose of changing the domicile of the Company. Each certificate representing shares of the Company now or hereafter owned by the Officer or issued to any Permitted Transferee shall bear the following legend: "THE SALE, PLEDGE, HYPOTHECATION OR TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF A CERTAIN MANAGEMENT AGREEMENT BY AND BETWEEN THE SHAREHOLDER AND THE CORPORATION. COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE CORPORATION." A Permitted Transferee is the Officer's ancestors, descendants or spouse or to a trust for their benefit.

4.4     Death or Total Disability of Officer. If Officer dies or becomes totally disabled during the term of this Agreement, Officer's contract under this Agreement shall automatically terminate.

4.5     Survival. The covenants contained in this Section 4 shall survive any termination of the Officer's services.

5.     Arbitration. Any dispute arising under or in connection with any matter related to this Agreement or any related agreement shall be resolved exclusively by arbitration, provided that the Company shall not be required to arbitrate any dispute as to which the Company seeks equitable relief.

6.     Miscellaneous.

6.1     Successors and Assigns; Binding Agreement. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns; provided, however, that the duties of the Officer hereunder are personal to the Officer and may not be delegated or assigned by him.

6.2     Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the Nation of Bermuda without regard to choice of law rules thereof.

6.3     Waivers. The waiver by either party hereto of any right hereunder of any failure to perform or breach by the other party hereto shall not be deemed a waiver of any other right hereunder or of any other failure or breach by the other party hereto, whether of the same or a similar nature or otherwise. No waiver shall be deemed to have occurred unless set forth in a writing executed by or on behalf of the waiving party. No such written waiver shall be deemed a continuing waiver unless specifically stated therein, and each such waiver shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

3

6.4    _Severability_.  If for any reason any term or provision of this Agreement is held to be invalid or unenforceable, all other valid terms and provisions hereof shall remain in full force and effect, and all of the terms and provisions of this Agreement shall be deemed to be severable in nature.

6.5    _Entire Agreement_.  This Agreement constitutes the entire agreement between the parties hereto, and supersedes all prior oral and/or written understandings and/or agreements between the parties hereto. This Agreement shall serve as termination and cancellation of all prior written and verbal employment, consulting, and/or advisory agreements and understanding by and between the parties hereto.

6.6    _Descriptive Headings_.  The parties hereto agree that the headings of the several paragraphs of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

6.7    _No Strict Construction_.  The language used in this Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any person.

IN WITNESS WHEREOF, each of the parties hereto has caused this Management Agreement to be executed on its behalf on the date first indicated above.

OFFICER:                                                 RPOST INTERNATIONAL LIMITED

_____                By: _____
                                                              Name: Terrance Tomkow
                                                              Title:   Officer

Exhibit A.

Duties: Serve at the direction of the Board of Directors to manage the administrative matters of the Company in Bermuda.

4

**34**

# EXHIBIT B

## RPOST INTERNATIONAL LIMITED

## RIGHT OF FIRST REFUSAL AND CO-SALE AGREEMENT

This Right of First Refusal and Co-Sale Agreement (the "Agreement") is made and entered into as of May   2004 by and among Kenneth Barton, Zafar Khan and Terrance Tomkow (the "Founders"), RPost International Limited, a company organized under the laws of Bermuda (the "Company"), and the holders of Series B Convertible Preferred Stock, Series C Convertible Preferred Stock, Series D Convertible Preferred Stock and Series E Convertible Preferred Stock (the "Series E Holders") of the Company listed on Exhibit A to this Agreement (each an "Investor").

### RECITALS

The Company and the Series E Holders have entered into a Series E Preferred Stock Purchase Agreement (the "Purchase Agreement") dated May   2004 pursuant to which the Company desires to sell to the Series E Holders and the Series E Holders desire to purchase from the Company shares of the Company's Series E Preferred Stock. A condition to the Series E Holders' obligations under the Purchase Agreement is that the Company, the Founders and the Investors enter into this Agreement in order to provide the Investors the opportunity to purchase and/or participate, upon the terms and conditions set forth in this Agreement, in subsequent sales by the Founders of shares of the Company's Common Stock. The Company and the Founders desire to induce the Series E Holders to purchase shares of Series E Preferred Stock pursuant to the Purchase Agreement by agreeing to the terms and conditions set forth below.

### AGREEMENT

The parties agree as follows:

1.    **Sales by Founders.**

1.1    **Notice of Sales; Assignment of Company Right of First Refusal.**

(a)    Should any Founder (or a Permitted Transferee, as defined below) propose to accept one or more bona fide offers (collectively, a "Purchase Offer") from any persons to purchase shares of the Company's Common Stock (the "Shares") from such Founder (other than as set forth in Section 1.5 of this Agreement), such Founder shall promptly deliver a notice (the "Notice") to the Company and each Investor stating the terms and conditions of such Purchase Offer including, without limitation, the number of Shares proposed to be sold or transferred, the nature of such sale or transfer, the consideration to be paid, and the name and address of each prospective purchaser or transferee.

(b)    The Company agrees that in the event that the Company declines to exercise in full the right of first refusal set forth in Section 2.3 of the Series E Investors Rights Agreement between such Founder and the Company (the "Right of First Refusal"), the Company will provide each Investor with notice of such determination at least fifteen (15) days prior to the

0427802.01

**36**

without regard to the minimum number of Conversion Shares described in the first sentence of this Section 1.6 if the transferee is a constituent partner or member of such Investor or an entity controlling, controlled by or under common control with such Investor.

2.    **Transfer Restrictions.**

2.1    **Prohibited Transfers.**  Any attempt by a Founder to transfer Shares in violation of Section 1 of this Agreement shall be void and the Company agrees it will not effect such a transfer nor will it treat any alleged transferee as the holder of such shares without the written consent of the holders of a majority of the Conversion Shares.

2.2    **Legended Certificates.**  Each certificate representing shares of the Common Stock of the Company now or hereafter owned by the Founders or issued to any Permitted Transferee pursuant to Section 1.5 shall bear the following legend:

"THE SALE, PLEDGE, HYPOTHECATION OR TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF A CERTAIN RIGHT OF FIRST REFUSAL AND CO-SALE AGREEMENT BY AND BETWEEN THE STOCKHOLDER, THE CORPORATION AND CERTAIN HOLDERS OF COMMON AND PREFERRED STOCK OF THE CORPORATION.  COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE CORPORATION."

3.    **Termination.**

3.1    **Termination Events.**  This Agreement shall terminate upon the earliest to occur of any one of the following events (and shall not apply to any transfer by a Founder in connection with any such event):

(a)    The liquidation, dissolution or indefinite cessation of the business operations of the Company;

(b)    The execution by the Company of a general assignment for the benefit of creditors or the appointment of a receiver or trustee to take possession of the property and assets of the Company;

(c)    A firm commitment underwritten public offering by the Company of shares of its Common Stock pursuant to a registration statement on Form S-1 under the Securities Act of 1933, as amended, the public offering price of which is not less than $3.25 per share (appropriately adjusted for any stock split, dividend, combination or other recapitalization) and which results in aggregate cash proceeds to the Company of $10,000,000 (net of underwriting discounts and commissions); or

(d)    The sale, conveyance or disposal of all or substantially all of the Company's property or business or the Company's merger with or into or consolidation with any other corporation (other than a wholly-owned subsidiary corporation) or if the Company effects

0427802.01                                    -4-

**37**

**RESOLUTIONS IN WRITING** of the Sole Shareholder of **RPost Communications Limited** (the "Company"), adopted as the Statutory General Meeting and also the First Annual General Meeting of the Company for **2011** pursuant to Section 77A of the Companies Act, 1981 as at **17th February 2011**.

We, the undersigned, being the Sole Shareholder of the Company, do hereby approve, in accordance with the Bye-Laws of the Company, the following actions without a meeting:

1.    STATUTORY AND ANNUAL GENERAL MEETING

**RESOLVED** that the Resolutions in Writing of the Sole Shareholder of the Company contained herein shall be deemed to constitute the Statutory General Meeting and Annual General Meeting of the Company for 2011 in accordance with Section 77A of the Companies Act, 1981.

2.    BYE-LAWS

**RESOLVED** that the Bye-laws, as subscribed by the Subscribers to the Memorandum of Association and submitted to the Sole Shareholder be and they are hereby approved and confirmed.

3.    INVESTORS' RIGHTS AGREEMENT

**RESOLVED** that the Investors' Rights Agreement as submitted to the Shareholders be and they are hereby approved and confirmed.

4.    SHARE OPTION PLAN

**RESOLVED** that the Share Option Plan as submitted to the Shareholders be hereby approved and confirmed.

5.    FORM OF RESTRICTED SHARE AGREEMENT

**RESOLVED** that the form of the Restricted Share Agreement as submitted to the Shareholders be hereby approved and confirmed.

6.    FORM OF WARRANT AGREEMENT

**RESOLVED** that the form of the Share Warrant Agreement as submitted to the Shareholders be hereby approved and confirmed.

RPost Communications Limited – Shareholder's EGM 2011 RIWs: 17ᵗʰ February 2011                    2.

7.    ELECTION OF DIRECTORS

(a)    **RESOLVED** that the number of Directors be **SIX**.

(b)    **RESOLVED** that the following persons being eligible be and are hereby appointed Directors until the next Annual General Meeting or until their appointment is terminated in accordance with the Bye-Laws.

DIRECTORS

Zafar Khan
Terrence A. Tomkow

(c)    **RESOLVED** to give general authorization to the Board to fill vacancies on the Board and to appoint Alternate Directors as it may see fit from time to time in accordance with the Company's Bye-laws.

(d)    **RESOLVED** that the Directors serve without fee.

8.    AUDITORS

**UNANIMOUSLY RESOLVED** that pursuant to Section 88 of the Companies Act 1981 the appointment of Auditors for the Company to the close of the next Annual General Meeting be waived because the Sole Shareholder receives adequate financial information and there is no need for the protection of an audit.

9.    SHARE CAPITAL

**RESOLVED** that the authorized share capital of the Company be fixed at US$120,000.00, and that the minimum share capital of the Company be NIL as specified in the Company's Memorandum of Association.

**IN WITNESS WHEREOF** the Sole Shareholder has executed these Resolutions in Writing to be effective the day and year set out above.

For Alexander Management Ltd. -- Sole Shareholder

_____
James Watlington – Authorized Signatory

# RPOST COMMUNICATIONS LIMITED
## RESTRICTED COMMON SHARE AGREEMENT
### FEBRUARY 2011

This Restricted Common Share Agreement (the "Agreement") is made and entered into as of February 2011 by and among Common Shareholders with such reference to this Restricted Common Share Agreement as noted on their Restricted Common Share Purchase Agreement, as well as all employees, consultants, agents, brokers or affiliates that may exercise share options or warrants for Common Shares in which the effective date of this Restricted Common Share Agreement for those parties would be the date of exercise of such Common share options or warrants (the "Purchaser"), and RPost Communications Limited, a company organized under the laws of Bermuda (the "Company").

RECITALS

The Company and the Purchaser wish to enter into a Share Purchase, Share Option, or Share Warrant Agreement (the "Purchase Agreement") pursuant to which the Company desires to sell to the Purchaser Common shares of the Company, offer Common Share Warrants, or offer Common Share Options, and the Purchaser agrees that such resulting Common Shares are to be restricted from sale, transfer, pledge, or hypothecation until such time in which certain events occur.

AGREEMENT

The parties agree as follows:

1.      Sales by Purchasers. The Purchaser acknowledges that all sales, transfers, pledges, or hypothecation of shares of the Company must be pre-approved by the Board of Directors of the Company and that Company has no obligation to approve such requested sale, transfer, pledge, or hypothecation of shares of the Company, or to register or qualify the Securities for resale except as set forth in the Investors' Rights Agreement.

1.1      Notice of Sales. Should any Purchaser (or a Permitted Transferee, as defined below) propose to accept one or more bona fide offers (collectively, a "Purchase Offer") from any persons to purchase shares of the Company's Common Stock (the "Shares") from such Purchaser, such Purchaser shall promptly deliver a notice (the "Notice") to the Company and stating the terms and conditions of such proposed Purchase Offer including, without limitation, the number of Shares proposed to be sold or transferred, the nature of such sale or transfer, the consideration to be paid, the name and address of each prospective purchaser or transferee, and the qualification as a Permitted Transfer as defined within this Agreement. The Purchaser agrees that all sales, transfers, pledges, or hypothecation of shares of the Company must be pre-approved by the Board of Directors of the Company and that Company has no obligation to approve such requested sale, transfer, pledge, or hypothecation of shares of the Company, or to register or qualify the Securities for resale except as set forth in the Investors' Rights Agreement. The Company may declines the request for sale without disclosing any reason.

1.2 Calculation of Shares.  Upon pre-approval by the Board of Directors of the Company, or subject to the terms of the Investors' Rights Agreement, each Investor may sell all or any part of the number of Common Shares of the Company issued or issuable upon conversion of share options or warrants received in connection with any stock dividend, stock split or other share award or grant.

1.3 Delivery of Certificates.  If the sale request is granted by the Company with confirmation of such granted request in writing, each Purchaser may affect its participation in the sale by delivering to the Company for transfer to the prospective purchaser one or more certificates, properly endorsed for transfer, which represent the Shares which such Purchaser elects to sell.

1.4 Transfer.  In the event that a sale request is granted, the share certificate or certificates which the Purchaser delivers to the Company shall be accepted by the Company only with a pre-payment of such costs that the Company shall declare as reasonable costs to cover any lawyer's fees, securities filings, due diligence on the proposed purchaser, and other regulatory

1

RPost Communications Limited

Restricted Common Share Agreement

and compliance costs that may be deemed by the Company to be useful or necessary to affect the transfer of shares. The Transferee must agree to be and shall be bound by the terms of this Agreement.

1.5. **Permitted Transactions.** The provisions of Section 1 of this Agreement shall not pertain or apply to:

(a)       Any repurchase of Common Stock by the Company;

(b)       Any transfer to a Purchaser's ancestors, siblings, descendants or spouse or to a trust for their benefit; provided, in each case, that (i) the Purchaser(s) shall inform the Company of such event prior to effecting it, and (ii) the pledgee, transferee or donee (each a "Permitted Transferee") shall furnish the Company with a written agreement to be bound by and comply with all provisions of this Agreement applicable to the Purchaser and the Purchaser shall be obligated to pre-pay costs and fees as described in Section 1 of this Agreement.

2.        Transfer Restrictions and Termination of Restrictions.

2.1       **Prohibited Transfers.** Any attempt by a Purchaser to transfer Shares in violation of Section 1 of this Agreement shall be void and the Company agrees it will not affect such a transfer nor will it treat any alleged transferee as the holder of such shares without the written consent of the holders of a majority of the Conversion Shares.

2.2       **Legended Certificates.** Each certificate representing Common Shares of the Company now or hereafter or issued to any Permitted Transferee pursuant to Section 1.5 shall bear the following legend:

"THE SALE, PLEDGE, HYPOTHECATION OR TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF A CERTAIN RESTRICTED SHARE AGREEMENT BY AND BETWEEN THE SHAREHOLDER AND THE COMPANY. COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE COMPANY."

2.3       **Termination Events.** This Agreement shall terminate upon the earliest to occur of any one of the following events (and shall not apply to any transfer by a Purchaser in connection with any such event):

(a)       The liquidation, dissolution or indefinite cessation of the business operations of the Company;

(b)       The execution by the Company of a general assignment for the benefit of creditors or the appointment of a receiver or trustee to take possession of the property and assets of the Company;

(c)       A firm commitment underwritten public offering by the Company of shares of its Common Stock pursuant to a registration statement on Form S-1 under the Securities Act of 1933, as amended, the public offering resulting in aggregate cash proceeds to the Company of $10,000,000 (net of underwriting discounts and commissions); or

(d)       The sale, conveyance or disposal of all or substantially all of the Company's property or business or the Company's merger with or into or consolidation with any other corporation (other than a wholly-owned subsidiary corporation) or if the Company effects any other transaction or series of related transactions in which more than fifty percent (50%) of the voting power of the Company is disposed of and the Company is not the survivor, provided that this Section 3.1(d) shall not apply to a merger effected exclusively for the purpose of changing the domicile of the Company, what may be considered a spin-off, or re-capitalization.

2.4       **Removal of Legend.** At any time after the termination of this Agreement in accordance with Section 3.1, any holder of a share certificate legended pursuant to Section 2.2 may surrender such certificate to the Company for removal of such legend, and the Company will duly reissue a new certificate without the legend.

3. **Representations and Warranties of the Purchaser.** The Purchaser hereby represents and warrants to the Company that:

3.1       **Authorization.** The Purchaser has full power and authority to enter into the Restricted Common Share Purchase Agreements. This Agreement, when executed and delivered by the Company and Purchaser, will constitute valid and legally binding obligations of the Purchaser, enforceable in accordance with their terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of a specific performance, injunctive

2

**41**

relief, or other equitable remedies, or (b) to the extent the indemnification provisions contained in the Investors' Rights Agreement may be limited by applicable federal or state securities laws.

3.2     Purchase Entirely for Own Account.  This Agreement is made with the Purchaser in reliance upon the Purchaser's representation to the Company, which by the Purchaser's execution of this Agreement, the Purchaser hereby confirms, that the Securities to be acquired by the Purchaser will be acquired for the Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same.  By executing this Agreement, the Purchaser further represents that the Purchaser does not presently have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to any of the Securities. The Purchaser has not been formed for the specific purpose of acquiring the Securities.

3.3     Disclosure of Information.  The Purchaser has had an opportunity to discuss the Company's business, management, financial affairs and the terms and conditions of the offering of the Shares with the Company's management and has had an opportunity to review the Company's facilities.  The Purchaser understands that such discussions, as well as the Business Plan and any other written information delivered by the Company to the Purchaser, were intended to describe the aspects of the Company's business, which the Purchaser believes to be material. The Purchaser is not affiliated with any money laundering or terrorist organizations.  The Purchaser has disclosed to the Company in writing a description of any and all legal actions that the Purchaser has ever been involved in or initiated on behalf of the Purchaser or a group of shareholders against any company in which the Purchaser has invested in or owns a stake in.

3.4     Restricted Securities.  The Purchaser understands that the Securities have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Purchaser's representations as expressed herein.  The Purchaser understands that the Securities are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, the Purchaser must hold the Securities indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available.  The Purchaser acknowledges that the Company has no obligation to register or qualify the Securities for resale except as set forth in the Investors' Rights Agreement.  The Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Securities, and on requirements relating to the Company which are outside of the Purchaser's control, and which the Company is under no obligation and may not be able to satisfy.

3.5     No Public Market.  The Purchaser understands that no public market now exists for any of the securities issued by the Company, and that the Company has made no assurances that a public market will ever exist for the Securities.

3.6     Legends.  The Purchaser understands that the Securities and any securities issued in respect of or exchange for the Securities, may bear one or all of the following legends in addition to the Legend in Section 2.2:
(a)     "The shares represented by this Certificate have not been registered under the Securities Act of 1933, as amended (the "Act"), or applicable state securities laws and may not be offered, sold or otherwise transferred, pledged or hypothecated unless and until such shares are registered under the Act and such laws or (1) registration under applicable state securities laws is not required and (2) an opinion of counsel satisfactory to the Company is furnished to the Company to the effect that registration under the Act is not required."
(b)     Any legend set forth in or required by the other Transaction Agreements.
(c)     Any legend required by the securities laws of any state to the extent such laws are applicable to the shares represented by the certificate so legended.

3.7     Accredited Investor.  An accredited investor is as defined in Rule 501(a) of Regulation D promulgated under the Securities Act, as amended.

3.8      Exculpation Among Purchasers.  Each Purchaser acknowledges that it is not relying upon any person, firm or corporation, other than the Company and its officers and directors, in making its investment or decision to invest in the Company.  Each Purchaser agrees that no Purchaser nor the respective controlling persons, officers, directors, partners, agents, or employees of any Purchaser shall be liable to any other Purchaser for any action heretofore or hereafter taken or omitted to be taken by any of them in connection with the purchase of the Securities.

4.        Miscellaneous.

4.1      Successors and Assigns.  Except as otherwise provided herein, this Agreement and the rights and obligations of the parties hereunder shall inure to the benefit of, and be binding upon, the parties' respective successors, assigns and legal representatives.

4.2      Amendments and Waivers.  Any term of this Agreement may be amended or waived only with the written consent of the Purchaser, the Company and a majority of the Common Shareholders (or their respective successors and assigns) voting together as a class.

4.3      Notices.  Any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient on the date of delivery, when delivered personally or by overnight courier or sent by telegram or fax, return receipt email where the delivery receipt can be verified for time of receipt and content delivered, or forty-eight (48) hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, and addressed to the party to be notified at such party's address on record with the Company, or as subsequently modified by written notice.

4.4      Severability.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith.  In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this Agreement, (b) the balance of the Agreement shall be interpreted as if such provision were so excluded and (c) the balance of the Agreement shall be enforceable in accordance with its terms.

4.5      Governing Law.  This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the Commonwealth of Bermuda, without giving effect to principles of conflicts of law.

4.6      Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

4.7      Titles and Subtitles.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

**Common Share Legend:**

*The shares represented by this Certificate have not been registered under the United States Securities Act of 1933, as amended (the "Act"), or applicable United States' state securities laws or with any other sovereign nation securities administration or laws ("Laws"), and may not be offered, sold or otherwise transferred, pledged or hypothecated unless and until such shares are registered under the Act and/or such Laws as may be required or (1) registration under applicable U.S. state securities or sovereign nation securities administration or laws is not required and (2) an opinion of counsel satisfactory to the Company is furnished to the Company to the effect that registration under the Act and/or Laws is not required.*

*This Certificate and the shares evidenced by this Certificate are also subject to restrictions on transfer contained in the Bye Laws of the Company and the Restricted Common Share Agreement dated February 2011 between the corporation and the Certificate Holder and no transfer of this Certificate or such shares shall be made unless the conditions specified in said Bye Laws and Agreement have been fulfilled and any requirements under the Act and/or Laws are satisfied. A copy of the Bye Laws and Agreement are on file and available for inspection at the principal offices of the Company.*

*The Company will furnish without charge to each shareholder who so requests the powers, designations, preferences and relative, participating, optional or other special rights of each class of shares or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.*

**Preferred Share Certificate Legend**

*The shares represented by this Certificate have not been registered under the United States Securities Act of 1933, as amended (the "Act"), or applicable United States' state securities laws or with any other sovereign nation securities administration or laws ("Laws"), and may not be offered, sold or otherwise transferred, pledged or hypothecated unless and until such shares are registered under the Act and/or such Laws as may be required or (1) registration under applicable U.S. state securities or sovereign nation securities administration or laws is not required and (2) an opinion of counsel satisfactory to the Company is furnished to the Company to the effect that registration under the Act and/or Laws is not required.*

*This Certificate and the shares evidenced by this Certificate are also subject to restrictions on transfer contained in the Bye-Laws of the corporation dated March 2011 and the terms of the Investors' Rights Agreement dated March 2011, and no transfer of this Certificate or such shares shall be made unless the conditions specified in said Bye-Laws and Agreement have been fulfilled and any requirements under the Act and/or Laws are satisfied.  A copy of the Bye-Laws and Agreement are on file and available for inspection at the principal offices of the Company.*

*The Company will furnish without charge to each shareholder who so requests the powers, designations, preferences and relative, participating, optional or other special rights of each class of shares or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.*

**EXHIBIT C**



# REGISTERED EMAIL® TECHNOLOGY

# RPOST COMMUNICATIONS LIMITED

CONFIDENTIAL BUSINESS PLAN

AND STANDARD PREFERRED SHARE

FINANCING MEMORANDUM

JULY 2012

WWW.RPOST.COM

V-120716

## II. CONFIDENTIALITY AND DISCLAIMER SUMMARY

This Confidential Memorandum has been prepared for discussion purposes only. It is submitted on a confidential basis for use by a limited number of parties solely in connection with a proposed transaction with RPost Communications Limited, a Bermuda corporation (the "Company" or "RCom"). This Memorandum is being delivered, on behalf of the Company, to assist the recipient in deciding whether to proceed with a further investigation of the Company. By accepting this Memorandum, the recipient agrees to keep confidential the information contained herein or made available in connection with any further investigation of the Company. In addition, the recipient agrees not to reproduce this Memorandum in whole or in part, and if the recipient does not wish to pursue an investigation of the Company, the recipient will return this Memorandum to the Company as soon as practical, together with any other materials relating to the Company which the recipient may have received from the Company or an Advisor to the Company. If this Memorandum is received in electronic form, the recipient agrees not to redistribute the document and agrees to destroy the data file of the document. This Confidential Business Plan and Standard Preferred Share Financing Memorandum July 2012 (the "Memorandum") relates to the private offer and sale (the "Offering") of up to 3.17 million Standard Preferred Shares (the "Preferred Shares") of the Company. All of the Preferred Shares will be sold pursuant to the Memorandum which includes the RPost Communications Limited Confidential Business Plan and Standard Preferred Share Financing Memorandum July 2012 as well as the Purchase Agreement made up of the RPost Communications Limited Standard Preferred Share Purchase Agreement with Exhibit A Schedule of Exceptions dated July 14, 2012, Exhibit B RPost Communications Limited Investors' Rights Agreement March 2011, and Exhibit C RPost Communications Limited Bye-Laws March 2012 (the "Agreement"). Any Convertible Debt will be sold pursuant to a Subordinated Convertible Debt Agreement and Promissory Note, with such investors referring to this Memorandum for disclosures and a discussion of risks. This Offering is being made directly by the Company (i) in the United States only to accredited investors, as that term is defined in Rule 501(a) of Regulation D under the Securities Act of 1933, as amended (the "Securities Act") and (ii) outside the United States to certain qualified investors.

NO PUBLIC MARKET EXISTS FOR ANY OF THE COMPANY'S SECURITIES, INCLUDING THE STANDARD PREFERRED SHARES, AND NO PUBLIC MARKET IS EXPECTED TO DEVELOP AFTER THIS OFFERING. THE STANDARD PREFERRED SHARES AND ANY COMMON SHARES ISSUABLE UPON CONVERSION OF THE STANDARD PREFERRED SHARES WILL BE SUBJECT TO RESTRICTIONS AND MAY NOT BE RESOLD OR TRANSFERRED EXCEPT THROUGH REGISTRATION OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH AN OFFER OR SOLICITATION IS NOT AUTHORIZED OR IS UNLAWFUL. INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, TAX OR INVESTMENT ADVICE. EACH INVESTOR SHOULD SEEK HIS OR HER OWN LEGAL, TAX AND INVESTMENT ADVICE FROM QUALIFIED PROFESSIONALS PRIOR TO MAKING A DECISION WITH REGARDS TO A SHARE PURCHASE. NO DEALER, SALESMAN OR OTHER PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION ON BEHALF OF RCOM RELATED TO THIS TRANSACTION OTHER THAN AS SET FORTH IN THIS MEMORANDUM.

AN INVESTMENT IN THE COMPANY'S STANDARD PREFERRED SHARES IS SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK. SEE "RISK FACTORS" SECTION OF THE CONFIDENTIAL BUSINESS PLAN AND STANDARD PREFERRED SHARE FINANCING MEMORANDUM FOR A DISCUSSION OF CERTAIN FACTORS THAT YOU SHOULD CONSIDER BEFORE YOU INVEST. INVESTMENT IN THIS OFFERING INVOLVES SIGNIFICANT RISKS AND SHOULD BE CONSIDERED ONLY BY SOPHISTICATED INVESTORS WHO CAN BEAR THE ECONOMIC RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD AND WHO CAN AFFORD TO SUSTAIN A TOTAL LOSS OF THEIR INVESTMENT. THE STANDARD PREFERRED SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR ANY APPLICABLE STATE SECURITIES LAWS. NEITHER THE SECURITIES EXCHANGE COMMISSION ("SEC") NOR HAS ANY STATE REGULATORY AUTHORITY APPROVED OR DISAPPROVED THESE SECURITIES OR THE TERMS OF THIS OFFERING OR DETERMINED IF THIS MEMORANDUM IS TRUTHFUL OR COMPLETE. IT IS ILLEGAL FOR ANY PERSON TO TELL YOU OTHERWISE. THE SECURITIES ARE EXEMPT FROM REGISTRATION UNDER REGULATION D AND/OR SECTION 4(2) OF THE SECURITIES ACT, AND SIMILAR EXEMPTIONS FROM REGISTRATION PROVIDED BY CERTAIN STATE SECURITIES LAWS. REGULATION D SETS FORTH CERTAIN RESTRICTIONS AS TO THE NUMBER AND NATURE OF PURCHASERS OF SECURITIES OFFERED PURSUANT THERETO. RCOM HAS ELECTED TO OFFER SECURITIES ONLY TO ACCREDITED INVESTORS AS SET FORTH IN RULE 501(A) OF REGULATION D AND THEREFORE EACH INVESTOR IN THE CONTEMPLATED OFFERING MAY BE REQUIRED TO AGAIN MAKE REPRESENTATIONS AS TO THE BASIS UPON WHICH HE OR SHE QUALIFIES AS AN ACCREDITED INVESTOR.

THE COMPANY IS OFFERING THE STANDARD PREFERRED SHARES ONLY TO ACCREDITED INVESTORS WHO HAVE THE NET WORTH AND SOPHISTICATED INVESTMENT BACKGROUND NECESSARY TO PERMIT THE OFFERING AND SALE OF THE PREFERRED SHARES IN RELIANCE UPON THE EXEMPTIONS AND WHO MEET THE SUITABILITY STANDARDS SET FORTH IN THIS MEMORANDUM AND THE STANDARD PREFERRED SHARE PURCHASE AGREEMENT. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL TO OR A SOLICITATION OF AN OFFER TO BUY FROM ANYONE IN ANY STATE OR OTHER JURISDICTIONS IN WHICH AN OFFER OR SOLICITATION IS NOT AUTHORIZED, OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE AN OFFER OR SOLICITATION. THE COMPANY RESERVES THE RIGHT IN THE COMPANY'S SOLE DISCRETION, AND FOR ANY REASON WHATSOEVER, TO MODIFY, AMEND AND/OR WITHDRAW ALL OR A PORTION OF THE OFFERING AND/OR ACCEPT OR REJECT IN WHOLE OR IN PART ANY PROSPECTIVE INVESTMENT IN THE STANDARD PREFERRED SHARES OR CONVERTIBLE DEBT OR TO ALLOT TO ANY PROSPECTIVE INVESTOR LESS THAN THE AMOUNT OF STANDARD PREFERRED SHARES SUCH INVESTOR DESIRES TO PURCHASE OR TO LIMIT OR INCREASE THE TOTAL AMOUNT OF INVESTMENT IN THE STANDARD PREFERRED SHARE FINANCING. THE COMPANY SHALL HAVE NO LIABILITY WHATSOEVER TO ANY OFFEREE AND/OR INVESTOR IN THE EVENT THAT ANY OF THE FOREGOING SHALL OCCUR.

THIS MEMORANDUM INCLUDES PROJECTIONS, MANAGEMENT VIEWS AND OTHER FORWARD-LOOKING INFORMATION. THE PROJECTIONS, MANAGEMENT VIEWS AND INFORMATION ARE BASED ON ASSUMPTIONS AS TO FUTURE EVENTS THAT ARE INHERENTLY UNCERTAIN AND SUBJECTIVE. THE COMPANY MAKES NO REPRESENTATION OR WARRANTY AS TO WHETHER THE COMPANY WILL ATTAIN THE RESULTS PROJECTED OR THE MANAGEMENT VIEWS EXPRESSED. THE PROJECTIONS AND MANAGEMENT VIEWS OF THE COMPANY'S FUTURE PERFORMANCE ARE BASED ON CERTAIN ASSUMPTIONS AND THE ACTUAL RESULTS MAY MATERIALLY AND ADVERSELY VARY FROM THE RESULTS PROJECTED OR THE MANGEMENT VIEWS EXPRESSED. YOU SHOULD CONDUCT YOUR OWN INVESTIGATION OF THE COMPANY AND ITS PROSPECTS TO DETERMINE THE MERITS AND RISKS OF THE INVESTMENT. DOLLAR VALUES IN THIS REPORT ARE IN UNITED STATES DOLLARS. FIGURES IN THIS MEMORANDUM THAT REFER TO TOTAL ENABLED USERS ARE SUBJECTIVE AND RELY ON INFORMATION REPORTED TO MANAGEMENT BY THIRD PARTY COMPANIES. MANAGEMENT CANNOT DIRECTLY VERIFY ALL OF THIS INFORMATION AND MAKES NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF SUCH FIGURES. THESE FIGURES ARE ESTIMATED ON A BEST-EFFORTS BASIS.

THE INFORMATION CONTAINED IN THIS MEMORANDUM MAY CHANGE AFTER JULY 14, 2012. THE COMPANY DOES NOT INTEND TO UPDATE THE INFORMATION CONTAINED IN THIS MEMORANDUM. PRIOR TO THE CLOSING, ANY PROSPECTIVE INVESTOR MAY ASK QUESTIONS OF AND RECEIVE ANSWERS FROM THE COMPANY'S REPRESENTATIVES CONCERNING (1) RCOM, (2) THE TERMS AND CONDITIONS OF THE OFFERING AND (3) ANY ADDITIONAL RELEVANT INFORMATION IN THE COMPANY'S POSSESSION. YOU SHOULD NOT RELY UPON INFORMATION NOT CONTAINED IN THIS MEMORANDUM UNLESS AN OFFICER OF RPOST COMUNICATIONS LIMITED AS INDICATED PROVIDES IT. IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATIONS OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THE COMPANY IS IN NO WAY AFFILIATED WITH THE UNITED STATES POSTAL SERVICE. THE COMPANY USES THE TERM "LEGAL" IN SOME OF ITS TRADEMARKS AND SOME SERVICE DESCRIPTIONS, HOWEVER THESE SHOULD NOT BE TAKEN AS EXPRESSING A LEGAL OPINION OR LEGAL ACCEPTABILITY ABOUT THE RCOM SERVICES. ITS SERVCES TRADEMARKS THE COMPANY MAY NOT SELL THE STANDARD PREFERRED SHARES OR ACCEPT ANY OFFER TO PURCHASE THE STANDARD PREFERRED SHARES AND CONVERTIBLE DEBT UNTIL THE COMPANY HAS DELIVERED TO YOU AND YOU HAVE EXECUTED THE AGREEMENT REFLECTING THE DEFINITIVE TERMS AND CONDITIONS OF THE OFFERING, WHICH INCLUDE THE MEMORANDUM. YOU SHOULD REVIEW CAREFULLY THE FULL TEXT OF THESE AGREEMENTS AND ALL OTHER DOCUMENTS AND AGREEMENTS PROVIDED TO PROSPECTIVE INVESTORS IN CONNECTION WITH THE OFFERING PRIOR TO PURCHASING STANDARD PREFERRED SHARES. THE COMPANY CONSIDERS YOUR PURCHASE COMPLETE UPON RECEIPT OF YOUR INVESTMENT FUNDS.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

23975 Park Sorrento, Suite 200
Calabasas, CA 91302

A true and correct copy of the foregoing document entitled (*specify*): _____
 Opposition to Motion to Convert Case _____
_____
_____

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) ___09/23/2013_____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☑ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) ___09/23/2013_____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

 Judge Zurzolo, US Bankruptcy Court, 255 E Temple Street, Suite 1360, Los Angeles, CA 90012

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 09/23/2013 | Lewis R. Landau | /s/ Lewis R. Landau |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                      **F 9013-3.1.PROOF.SERVICE**

| In re: Khan | CHAPTER: 13 |
| Debtor(s). | CASE NUMBER: 2:13-bk-19713 VZ |

**ADDITIONAL SERVICE INFORMATION (if needed):**

NEF Service List (category I):

Joely Khanh Linh Bui on behalf of Interested Party Courtesy NEF
wdk@wolffirm.com, joely.bui@wolffirm.com

Nancy K Curry (TR)
ecfnc@trustee13.com

Nancy K Curry (TR) on behalf of Trustee Nancy K Curry (TR)
ecfnc@trustee13.com

Lewis R Landau on behalf of Debtor Zafar David Khan
LLandau@HorganRosen.com

Lewis R Landau on behalf of Defendant Zafar David Khan
LLandau@HorganRosen.com

Scott E Shapiro, Esq on behalf of Creditor 126736 CANADA, INC.
scott.e.shapiro.esq@gmail.com

Scott E Shapiro, Esq on behalf of Creditor George Martin
scott.e.shapiro.esq@gmail.com

Scott E Shapiro, Esq on behalf of Creditor Thomas Burke
scott.e.shapiro.esq@gmail.com

Scott E Shapiro, Esq on behalf of Plaintiff 126736 CANADA, INC.
scott.e.shapiro.esq@gmail.com

Scott E Shapiro, Esq on behalf of Plaintiff George Martin
scott.e.shapiro.esq@gmail.com

Scott E Shapiro, Esq on behalf of Plaintiff Thomas Burke
scott.e.shapiro.esq@gmail.com

United States Trustee (LA)
ustpregion16.la.ecf@usdoj.gov

Philip A Zampiello on behalf of Creditor Kenneth Barton
philipz@mkzlaw.com, PatrickM@mkzlaw.com;MichaelK@mkzlaw.com;VanessaB@mkzlaw.com

Philip A Zampiello on behalf of Plaintiff Kenneth Barton
philipz@mkzlaw.com, PatrickM@mkzlaw.com;MichaelK@mkzlaw.com;VanessaB@mkzlaw.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                          **F 9013-3.1**